**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 13-186-DLB-CJS**

**MICHAEL ROSS**                                                              **PLAINTIFF**

**vs.**                    **MEMORANDUM OPINION AND ORDER**

**BOARD OF EDUCATION OF MASON COUNTY, et al.**          **DEFENDANTS**

************************

## I. Introduction

Defendants Donald Pace, Rick Ross and the Mason County Board of Education (collectively, the "MCBE Defendants") move for summary judgment on Plaintiff Michael Ross' ("Ross") claim for First Amendment retaliation under 42 U.S.C. § 1983, arguing that Ross failed to prove the following elements: (1) he engaged in protected speech under the First Amendment; and (2) his transfer was motivated, at least in part, by his speech. The MCBE Defendants further contend that summary judgment is appropriate on Ross' state law claims because his transfer was neither punitive nor arbitrary and capricious. In the alternative, the MCBE Defendants maintain that they are entitled to immunity on all federal and state law claims asserted against them. The Court has jurisdiction over this matter pursuant to 32 U.S.C. §§ 1331 and 1367.

## II. Factual and Procedural Background

Michael Ross taught Agriculture at Mason County High School ("MCHS") from 1987 to 2013. (Docs. # 17-1 at 7; 17-3 at 1). He was the sole instructor in the Agriculture

1

Department for most of his tenure.  (Doc. # 17-1 at 80).  His courses were part of MCHS'

Career and Technical Education program, which encourages students to become "career-

certified" by completing three courses in a specific vocational "pathway" and passing the

Kentucky Occupational Skills Standards Assessment ("KOSSA") test.  (*Id.* at 15).  In

addition to the necessary certifications from the Educational Professional Standards Board

("EPSB"), Ross holds a Bachelor's degree in Agriculture Education and a Master's degree

in Vocational Education.[1]  (Doc. # 17-3 at 1).

While employed in this capacity, Ross also supervised the Future Farmers of

America club ("FFA") and coached the boys golf team.  (*Id.*).  He held a valid commercial

driver's license ("CDL"), which enabled him to transport these students to field trips and

competitions.[2]  (Doc. # 17-1 at 32).  Ross served as a teacher representative on  the Site-

Based Decision-Making Council[3] ("SBDM Council") and participated in numerous

professional organizations, including the Mason County Education Association ("MCEA"),

Kentucky Educators Association ("KEA") and Education Professional Standards Board

("EPSB").  (*Id.* at 8-11).  However, Ross' tenure was not without conflict.  He not only

---

1) As an Agriculture teacher, Ross was a "certified employee" within the meaning of KRS § 161.020(1)(a).  That subsection provides that "[n]o person shall be eligible to hold the position of superintendent, principal, teacher, supervisor, director of pupil personnel, or other public school position for which certificates may be issued, or receive salary for services rendered in the position, unless he or she holds a certificate of legal qualifications for the position, issued by the Educational Professional Standards Board."

2) Ross' work as a part-time bus driver also made him a "classified employee," defined as "an employee of a local district who is not required to have certification for his position as provided in KRS 161.020."  Ky. Rev. Stat. Ann. § 161.011(1)(a).

3) The SBDM Council is composed of parents, teachers and the principal or administrator.  *See* Ky. Rev. Stat. Ann. § 160.345(2)(a).  The Council must work towards the educational goals for all Kentucky schools, set forth in KRS § 158.645, as well as District-wide goals set by the MCBE.  *Id.*

clashed with administrators on fiscal and pedagogical concerns, he was disciplined for several safety infractions committed while transporting students.

On September 28, 2000, Ross used a van, on loan from the city of Maysville, to transport the boys golf team to a tournament in Glasgow, Kentucky. (*Id.* at 89-91). Prior to the trip, former Principal Wayne Keen ("Keen") allegedly told Ross that state law did not allow students to be transported in that type of vehicle. (Doc. # 17-5 at 8). Ross denied that such a discussion took place. (Doc. # 17-1 at 89-91). Keen sent Ross a letter of reprimand and recommended that he be prohibited from driving school buses or representing MCHS at co-curricular/extra-curricular events for one year. (Doc. # 17-5 at 9). Ross transported FFA students to an event in Louisville soon after. (Docs. # 17-1 at 95-96; 17-5 at 10). Although the record is not well-developed on this point, Ross allegedly disabled the video camera on the bus so that he could not be observed while driving. (Docs. # 17-3 at 9; 17-5 at 10).

On January 16, 2001, former Superintendent Tim Moore ("Moore") adopted Keen's recommendation. (Doc. # 17-5 at 10, 16). Citing Ross' conduct on both the Glasgow and Louisville trips as grounds for disciplinary action, Moore suspended Ross' bus driving and coaching privileges for one year, suspended his teaching responsibilities for two days without pay and instructed him to develop a positive communication plan. (*Id.*). Ross submitted his communication plan and served his suspension in due course. (Doc. # 17-1 at 97-98).

About two years later, Ross and Moore clashed over the issue of Ross' fifty-five days of extended employment. Under Kentucky law, Agriculture teachers are entitled to receive a salary for instructing students in agriculture experience programs during the

3

summer months.[4]  (Doc. # 17-1 at 67-69).  Moore allegedly tried to take away Ross'

statutorily mandated extra days, prompting Ross to file a lawsuit against Moore.  (*Id*.).

Ross' lawsuit coincided with administrative efforts to enhance the MCHS Agriculture

program by increasing student enrollment, involving local farmers and scheduling more site

visits during the school year.  (Docs. # 17-1 at 67-70; 17-5 at 19-30).  As part of this

initiative, Moore informed Ross that he needed to have a certain number of students in the

Agriculture program.  (Doc. # 17-1 at 77).  Although Ross acknowledged the importance

of student recruitment, he balked at Moore's suggested quota because he felt that it was

arbitrary.  (*Id*.).

Principal Steven Appelman ("Appelman") also tasked Ross with setting up an

advisory committee of local farmers and community leaders.  (Doc. # 17-1 at 112-13; 17-5

at 25).  This committee, dubbed the Mason County Agriculture Council, met for the first

time in Summer 2003.  (Docs. # 17-1 at 112-13; 17-5 at 25).  When the subject of student

enrollment came up, Ross allegedly began yelling about the Mason County Board of

Education's ("the Board") attempt to reduce his salary and hold him accountable for the

number of students in his class.  (Doc. # 17-5 at 19; Doc. # 17-1 at 121-124).  He also

reportedly accused Appelman and former Assistant Principal Dana Belcher of

---

4) KRS § 157.360(12)(a) provides as follows:

Instructional salaries for vocational agriculture classes shall be for twelve (12)
months per year.  Vocational agriculture teachers shall be responsible for the
following program of instruction during the time period beyond the regular school
term established by the local board of education: supervision and instruction of
students in agriculture experience programs; group and individual instruction of
farmers and agribusinessmen; supervision of student members of agricultural
organizations who are involved in leadership training or other activity required by
state or federal law; or any program of vocational agriculture established by the
Division of Career and Technical Education in the Department of Education.

misrepresenting his enrollment numbers and arranging the school schedule to hurt enrollment in his classes. (*Id.*). When asked about this incident at his deposition, Ross stated that he had been "falsely describe[d] . . . as yelling, enraged and belligerent." (Doc. # 17-2 at 1).

Moore, Appelman and Dana Belcher tried to meet with Ross and discuss the Council's progress, as well as his outburst, but he refused to answer questions without his lawyer present. (Docs. # 17-1 at 115-19; 17-5 at 21-24). Ross characterized this meeting as one of several occasions where Moore tried to intimidate him and indicated that the administrators had specifically changed the meeting time to ensure his lawyer's absence. (Doc. # 17-1 at 67-71). Ross ultimately received a written reprimand for "conduct unbecoming a teacher, insubordination, [and] unprofessional behavior." (Doc. # 17-5 at 31-32).

Moore later abandoned his plan to take away Ross' extended days, but conflict persisted between the two men. (Doc. # 17-1 at 72). In 2006, MCHS received funding to build a greenhouse.[5] (*Id.* at 73-75). Once construction began, Moore informed Ross that he would need to use the greenhouse year-round. (*Id.*). Ross felt that this "[wa]s ludicrous, in a greenhouse that can reach very high temperatures, even with a cooling system going, to have anything in there in the very hottest part of the year." (*Id.*). Ross tried to explain

---

5) Ross maintains that he and former Interim Superintendent Felici Felice made plans to build a greenhouse, but Moore tabled the proposed project early in his tenure. (Doc. # 17-1 at 78-79). According to Ross, this was but one of several proposals he made to expand the Agriculture program. He suggested that students be allowed to raise crops on the track during the off-season and reseed it during track and field season. (Doc. # 17-2 at 38-44). He also discovered that an individual was farming a small tract of land owned by MCHS, so he suggested that the students be allowed to raise soy beans. (*Id.*). Each time, he encountered road blocks from the administration. (*Id.*).

this to Moore, but felt that his point was not well-received.  (*Id.*).  Around this time, Ross heard from Appelman that Moore had expressed his intent to remove Ross from teaching if the greenhouse situation did not improve.  (*Id.* at 73).

The greenhouse sits on the same tract of land as MCHS' sports facility, known as the Carmeuse Complex ("the Complex").  Because the Complex sits across the street from the main campus, MCHS had to arrange for student transportation to and from the Complex.  (Docs. # 27 at 26; 17-5 at 6).  According to Appelman, these transportation concerns meant that the greenhouse was underutilized.  (*Id.*).  At Appelman's suggestion, Moore reinstated Ross' driving privileges, thus allowing Ross to transport Agriculture students to and from the greenhouse.  (*Id.*).

In Summer 2012, Ross used a school bus to transport a group of students to Hardinsburg, Kentucky.  (Doc. # 17-1 at 32).  Former Transportation Director Gerald Fulk ("Fulk") later reviewed bus camera footage from the trip and discovered that Ross had committed a number of safety violations.  (*Id.* at 49).  Fulk privately warned Ross that further safety violations would result in disciplinary action.  (*Id.* at 50).  Ross recalled that both men "left that meeting with the understanding that [Fulk] was disappointed," but that Ross' transportation efforts "w[ere] helpful in several respects from a supervisory standpoint."  (*Id.*).  Ross transported students on two more trips after that conversation took place.  (*Id.*).

Fulk remained troubled by Ross' conduct on the Hardinsburg trip.  (Doc. # 17-4 at 1-2).  Ross sped on multiple occasions and failed to secure items loaded onto the bus, which "would have become projectiles, striking the students and/or blocking the aisle of the bus," had there been an accident.  (*Id.*).  He had also allowed students to lash two fans to

6

seats at the rear of the bus, blocking visibility and causing him to back the bus into a signpost. (*Id.*). When asked to account for his actions, Ross explained that he had become accustomed to putting extra gear on the bus when a regular driver transported them to Hardinsburg, so he continued that practice. (Doc. # 17-5 at 1-2). He admitted that he "recognize[d] the risk involved in the manner in which some of the luggage and equipment had shifted," but felt that the risk became "more circumspect with the pictures." (*Id.*). He denied putting anyone in danger and promised to "concentrate on doing better in the future." (*Id.*). Fulk recommended that Ross be suspended from bus driving duties. (*Id.* at 7).

That same summer, Kentucky's Auditor of Public Accounts ("the State Auditor") conducted an audit of the Mason County School District (the "District"). (Doc. # 25 at 23-24). Although it is unclear what prompted the state audit, based on the record before this Court, Assistant Superintendent Kermit Belcher ("Belcher") heard that someone had filed a complaint with the Office of Education Accountability ("OEA") about the District's spending habits. (*Id.*; Doc. # 33 at 36-37). When the State Auditor released its report in Fall 2012, it revealed that administrators had paid for dinners at exclusive restaurants and nights in upscale hotels with District funds. (Doc. # 17-2 at 73). Ross published an editorial about the report in the local newspaper, criticizing both the administrators' excessive travel expenses and the Board's failure to immediately remove "employees that have treated district money as their own personal slush fund." (Doc. # 29-3 at 5).

A few weeks after the State Auditor released its report, Moore announced his retirement. (Doc. # 17-2 at 73). However, most of his Central Office staff remained in place. (Docs. # 25 at 23-24; 33 at 22-23). Belcher and former Associate Superintendent

Liz Pettit managed the Central Office's daily affairs while the Board searched for an Interim Superintendent.[6]  (*Id.*).

After seeing a job posting on the Kentucky School Board Association's ("KSBA") website, retired Clark County Superintendent Donald Pace ("Pace") applied for the Interim Superintendent position.  (Doc. # 33 at 8-9).  In the course of his career, Pace had crossed paths with some of the Board members.  (*Id.*).  He had also met Moore a few times at annual superintendent conferences, as well as school athletic events, but did not communicate with him regularly or give him professional advice.  (*Id.*).  None of these individuals contacted Pace about the job.  (*Id.*).  About one week after his interview, the Board officially hired Pace at its meeting, attended by thirty to fifty people.  (*Id.* at 12, 25-27).  Here, Pace heard for the first time about the "arrogance" of the prior administration and the "fear tactics" used to intimidate people.  (*Id.*).  He could not recall the identity of the speaker.  (*Id.*).

Pace felt that his "first charge . . . was to determine if policies and procedures were in place that would have been violated as indicated by the auditor's report."  (*Id.* at 17-18).  He followed up with individuals referenced in the State Auditor's report and asked them for individual responses to the allegations contained therein.  (*Id.* at 18).  Although Pace initially believed that the State Auditor's report revealed errors in judgment, rather than statutory violations, he later found the criticisms contained in the report to be legitimate.  (*Id.* at 18-22).  In an effort to diffuse the tension of the situation, Pace also told classified

---

6) Some Board members were not re-elected to their positions that Fall.  (Doc. # 33 at 41).  At least one of those members indicated that the "trumped-up allegations" in the State Auditor's report cost the members their positions.  (*Id.* at 41-42).

and certified staff that he "realized they were in a precarious situation," as they had likely established professional relationships and personal friendships with Moore. (*Id.*). He made it clear that he did not wish to disrupt any personal relationships, but would not permit staff members to discuss his day-to-day decisions with Moore. (*Id.*).

A few weeks into Pace's tenure, Ross asked to meet with him. (*Id.* at 25-28). Pace was still unfamiliar with most of teachers in the District, so Pace asked Central Office staff about Ross before their scheduled meeting. (*Id.*). Although Pace could not recall the source of this information, he was told that Ross may have been one of the individuals who contributed to the audit. (*Id.*). At their meeting, Ross informed Pace that he was President of the MCEA and offered several suggestions for boosting morale and improving overall operation in the District. (*Id.* at 35). Pace testified that he was not particularly receptive to Ross' suggestions because Ross was highly critical of the District and Moore, which made Pace feel "apprehensive." (*Id.* at 40).

Soon after, Pace received a phone call from one of the District's attorneys, Donald Ruberg ("Ruberg") who explained that Moore had filed a complaint against Ross for safety violations committed while transporting students. (*Id.* at 31-32). Pace asked Belcher and newly-appointed Transportation Director Larry Brewer ("Brewer") for more details about the incident. (*Id.* at 34).

In December 2012, Ross met with Pace and asked him to allow the MCEA to coordinate the search for the next school superintendent. (*Id.* at 44). Pace admits that he was not receptive to this suggestion because he felt that they "need[ed] to have an outside entity to perform this type of service," especially given "the perception of Mason County at that time." (*Id.* at 46). He was also under the impression that the KSBA or Kentucky

Association of School Administrators ("KASA") usually conducted such searches.  (*Id.* at 44).

Pace then told Ross that he thought the purpose of the meeting was to address the alleged safety violations.  (*Id.*).  When Pace asked whether he would like to share any information about these allegations, Ross admitted that most of them were true, but felt that he had been singled out because he had seen other drivers follow the same practices with impunity.  (*Id.* at 47-48).

Pace asked Ruberg for Ross' personnel files.  (*Id.* at 51).  Ruberg advised Pace not to review those files because he would likely have to decide whether or not to revoke Ross' driving privileges.  (*Id.*).  Pace heeded Ruberg's advice, but inquired further about Ross at Central Office.  (*Id.*).  Belcher informed Pace that Ross received positive annual evaluations with regard to his teaching.  (*Id.* at 52).

At its December meeting, the Board selected the KSBA to coordinate the superintendent search and hired CPA Susan Ross ("CPA Ross") to conduct an independent forensic audit of District finances.  (*Id.* at 53-54).  CPA Ross was supposed to pick up where the State Auditor left off and delve into the District's day-to-day financial transactions in much more detail.  (*Id.*).

After further reviewing Ross' transportation practices on the trip to Hardinsburg, Ruberg concluded that Ross should be terminated as a bus driver, based on the following five violations of federal, state and local law: (1) improper loading of the bus; (2) speeding; (3) operating the bus while using a cell phone; (4) driving the bus while the door was open; and (5) backing up the bus and denting it.  (Doc. # 17-3 at 9).  Given the allegations made and the information they had about his safety practices, Pace agreed that the District

"would certainly be liable" in the event of an accident.  (Docs. # 17-3 at 12; 33 at 55).

Pace sent Ross a letter notifying him of the decision to terminate his bus driving privileges.  (Doc. # 17-3 at 12).  He enclosed a form for appeal, which had to be "completed within ten (10) days of today's date."  (*Id.*).  When Belcher hand-delivered the letter, Ross asked whether the ten day period included normal days or just working days.  (Doc. # 33 at 55; Doc. # 17-1 at 38).  Although Belcher promised to find out, Ross never heard back from him.  (Doc. # 17-1 at 38).  Ross eventually decided to follow up on his own, but the time to appeal had already elapsed.  (*Id.*).

Pace reported Ross' safety infractions to the EPSB.  (Doc. # 17-3 at 13).  He characterized this action as "a routine mode of operation," stating that he automatically referred all issues concerning student safety to the EPSB.  (Doc. # 33 at 45-46, 59).  The EPSB admonished Ross for his misconduct and gave him thirty days to respond in writing or request a hearing, but he did neither.  (Docs. # 17-3 at 14; 17-1 at 45-46).  The admonishment remains on his record.  (Doc. # 17-1 at 46).

Acting in his capacity as MCEA President, Ross filed an Open Records Request with Board Chair Curtis Rosser ("Rosser") in February 2013.  (Doc. # 29-5).  Ross requested the following information: (1) a copy of the private audit report and all related documents; (2) names of current/former employees who made restitution to the District; (3) the amount and reason for those payments; (4) names of certified employees whose salary and/or benefits were increased above the amount received by all certified employees; and (5) the salary and benefits for current and former certified employees who worked in district administration for the past seven years.  (*Id.*).

11

Pace recalls that the Open Records Request made several employees uncomfortable because they did not want their salaries to be public knowledge. (Doc. # 33 at 39). In light of the recent audits, Pace was also "very hesitant to release information on my own without checking with counsel to assure that my actions were appropriate." (*Id.* at 57). He referred the request to the Board's regular attorney, Sue Brammer, who allegedly told Ross that the audit was ongoing. (*Id.*). The audit had not been completed by the time Pace left office. (*Id.* at 58).

About one month later, Pace received a few parent complaints about bullying in Ross' classroom while he was absent. (*Id.* at 60). These reports prompted Pace to review teachers' attendance records. (*Id.* at 61). He discovered that Ross and fellow vocational teacher Shannon Roberts ("Roberts") had twenty absences each, which Pace found excessive, given "the impact . . . on other students under their auspices." (Doc. # 28-1 at 87). He was also surprised to see that teachers could simply state the reason for their absence as "school business," without any further specificity. (Doc. # 33 at 66-67). After admonishing Principal Appelman for allowing excessive absences, Pace changed the absence policy for all MCHS faculty by requiring them to explicitly state what kind of school business required their absence from class. (*Id.*).

Pace also informed Ross and Roberts that they were "prohibited from additional professional or school business leave." (*Id.*). If any of their students were committed to co-curricular or extra-curricular activities in the remaining months of the school year, parents or other teachers would have to fill in for them. (*Id.*). Although Pace did not want students to miss out on co-curricular or extra-curricular activities, he also did not want the students who remained behind to suffer due to their teachers' absences. (*Id.*). Despite his

prohibition on further absences, Pace allowed Roberts to go to one competition where her daughter was a finalist.  (*Id.*).  After conferring with EPSB Executive Director Brown about the demands of EPSB membership that year, Pace also permitted Ross to attend two more meetings in Frankfort.  (*Id.*; Doc. # 17-5 at 53).

At the Board's spring meeting, Ross orally requested permission to conduct certain class activities at the Complex.  (Docs. # 33 at 72-73; 17-2 at 82-84).  Although Pace could not recall such a conversation at his deposition, emails suggest that Ross had spoken to Pace about the proposed activity prior to the meeting.  (Doc. # 17-5 at 62-63).  Pace told Ross to coordinate with Appelman.  (*Id.*).  Regardless, Pace took issue with the informal nature of Ross' request.  (Doc. # 33 at 72).  In Pace's personal experience, any requests for Board approval should be in writing so that the Board can review the proposal and formulate questions for the meeting.  (*Id.*).  Accordingly, Pace suggested to Chair Rosser that he "refrain from allowing the latitude recently granted to [Ross] as a separate entity from other citizens and/or staff at future meetings."  (Doc. # 28-1 at 100).  He then notified Ross that he would "no longer be allowed to address the Board with a new proposal that comes to your mind on the spur of the moment" and "is not germane to the Agenda item being consider[ed] for action."  (*Id.*).

As the 2012-2013 school year drew to a close, Pace, Appelman and Belcher began discussing plans for the 2013-2014 school year.  (Docs. # 27 at 21-22; 33 at 74).  Pace remembered "looking at the financial status of the school system and the anticipated expenditures for the next year, and [ ] primarily focusing on the balance to be left for the new superintendent coming on board."  (Doc. # 33 at 74). Stated simply, he did not want to incur any additional financial expenditures unless absolutely necessary.  (*Id.*).  Pace was

also trying to make sure that the "instructional program and teaching learning process [did] not falter during this particular period of time of transition that the school system was going to be going through." (*Id.* at 83). As the three men reviewed MCHS test scores, released in November 2012, it became clear that MCHS students had scored ahead in college readiness but lagged behind in career readiness.[7] (*Id.*; Doc. # 27 at 22). Thus, one of the primary concerns became increasing students' "pathways" to "career readiness." (Doc. # 27 at 22).

At this time, there were preliminary plans to hold Agriculture classes at the Complex on a regular basis. (Doc. # 33 at 21-22; 27 at 22-23). Ross himself engaged in discussions with Belcher and the guidance counselor about this prospect. (Doc. # 25 at 54). When Pace realized that Ross would not be able to transport students to and from the Complex, due to his suspension from bus driving, he became concerned about the costs of employing a full-time driver for that purpose. (Doc. # 33 at 74). Although buses regularly took students to the Mason County Area Technology Center during the school day, the Tech Center paid for transportation. (Doc. # 26 at 16-17). Another driver dropped track team members off at the Complex for after-school practices, but he was only able to do that because his regular downtown route was relatively short. (*Id.* at 80). According to Brewer, it would have been very difficult for one of the District's bus drivers to take responsibility for transportation of the Agriculture students in addition to their existing duties.[8] (*Id.*). Pace hoped to save this extra expense, as the District had already laid off eight staff members.

---

7) College readiness is measured by students' ACT scores, while career readiness is determined by students' KOSSA scores. (Doc. # 27 at 38).

8) Brewer testified to this effect at his deposition. However, he does not remember any discussion about moving students between the high school and the Complex. (Doc. # 26 at 26).

(Doc. # 33 at 74).

Pace recalls sharing these concerns with Appelman and Belcher, who allegedly suggested that Ross' vocational education certification might be useful in other ways. (*Id.* at 84). However, neither Appelman nor Belcher could remember making that suggestion. (Doc. # 25 at 55-56; 27 at 22-23). It is also unclear which of these men proposed transferring Ross to the Learning Academy (the "Academy"), which helps students who are falling behind academically or struggle in a traditional classroom environment. (Doc. # 27 at 37; 33 at 87-88). Pace remembers relying chiefly on what Appelman and Belcher told him, as he was unfamiliar with the Academy and MCHS' career readiness programs. (*Id.* at 87-88). However, the general idea seemed to be that "Ross had a specific certification that certified him for the teaching position in which the test scores were lacking." (*Id.* at 84).

When asked about the utility of Ross' vocational certification as an Academy teacher, Appelman pointed out that Terri Lippert, also a vocational teacher, had achieved some success at the Academy.[9] (*Id.*). He also felt that Ross' educational experience would be valuable, reasoning that "[s]ometimes you don't know who's going to be the best qualified but sometimes things work out." (*Id.* at 41). Because Ross was prohibited to drive a school bus, and thus unable to perform some of his duties as a teacher, "this open[ed] up another opportunity." (*Id.*). Belcher echoed this logic, stating that the primary reason for Ross' transfer was "his inability to drive a bus for the students," while the second reason was based on his Career and Technical Education ("CTE") certification, which

_____

9) Appelman acknowledged that there are not necessarily any Agriculture students in the Academy. (Doc. # 27 at 38). However, the Academy's computer-based learning program does include vocational offerings. (*Id.*).

would allow him to "offer those kids remediation in the Learning Academy." (Doc. # 25 at 66-67).

After much discussion, Pace decided not to renew retired Academy teacher Erin Neal's part-time contract so that there would be a space for Ross. (Doc. # 33 at 81). He then transferred Ross from his "position as Agriculture teacher at Mason County High School to teacher in the Learning Academy at the same school beginning the 2013-2014 school year." (Doc. # 29-1 at 1). On May 6, 2013, Ross received a letter notifying him of the decision and offering the following rationale in support thereof:

- Surrounding schools are outperforming Mason County High School (MCHS) in the area of career readiness. In an effort to provide students additional career pathways MCJS is revamping career readiness opportunities for all students. With your CTE certification you will be able to provide students pathways for career certification in the Learning Academy. Serving as the teacher of record you will facilitate various online career readiness courses. The students in the Learning Academy deserve the same opportunities as ALL students for career readiness and credit recovery. A certified CTE teacher is required in order for students to receive career readiness certification.

- In order to provide students real-world agriculture experiences these Agriculture courses will be offered at the Mason County/Carmeuse Complex starting the 2013-14 school year. Students will have access to the property's 70 acres and greenhouse for enhanced agriculture projects. As a result, students will need to be transported daily for multiple class changes between MCHS and Mason County/Carmeuse Complex. Consequently, the agriculture teacher shall have a valid CDL license to transport students to and from the site to prevent an additional financial burden to the school system. Your inability to drive a bus to transport students would necessitate the hiring of a separate bus driver to transport students.

(*Id.* at 1-2). The letter further stated Plaintiff Ross' salary would be reduced from $78,115.53 to $60,362.00 annually because his new position did not require him to work fifty-five extended days. (*Id.* at 2).

16

According to Ross, no one in the school district had spoken to him about the possibility of a transfer, so this decision came as a "[c]omplete surprise." (Doc. # 17-1 at 46). MCHS posted a vacancy for an Agriculture teacher shortly thereafter. (Doc. # 17-5 at 42-44). At Pace's suggestion, a valid CDL license was listed as one of the job requirements. (Doc. # 33 at 75-76). Ross submitted his resume, as well as a letter addressed to new Superintendent Rick Ross ("Supt. Ross"), stating his belief that he had been transferred as punishment for speaking out about the District. (Docs. # 17-2 at 35-38; 17-5 at 45-47). Supt. Ross never responded to the letter or the allegations contained therein. (Doc. # 17-2 at 35-38).

A group of teachers, parents and members of the local agricultural community handled the search for a new Agriculture teacher. (Doc. # 27 at 67-69). Teachers who had been successful in other districts were encouraged to apply. (*Id.* at 73-75). According to Appelman, who participated in the search, no one in the group wanted to consider Ross' application. (*Id.* at 67). After screening and interviewing several candidates, the group selected Andrew Sorrell ("Sorrell") as the new Agriculture teacher in June 2013. (*Id.* at 76-77). Although he did not have a valid CDL license, he obtained one shortly after being hired. (*Id.* at 84).

Most teachers start working in August, so Appelman mistakenly thought he could consult with the SBDM Council about Sorrell in July. (*Id.* at 78). Because the Agriculture position requires extended days, Sorrell technically began working before the SBDM Council approved him. (*Id.*). Appelman acknowledged this mistake at his deposition, but insisted that it had nothing to do with the fact that Ross' term on the SBDM Council was drawing to a close. (*Id.* at 79). He also stated that it was fair for the incoming SBDM

17

Council members to have some input on new staff members.  (*Id.*).  As a result, Ross did not get to vote on the decision to hire Sorrell as his replacement.  (*Id.*).  Ross later filed an OEA complaint about the Council's failure to follow proper procedures for selecting and approving an Agriculture teacher, but he has not heard back about it.[10]  (Doc. # 17-1).

Ross began serving as a teacher at the Academy during the 2013-2104 school year. (Doc. # 17-1 at 12-13).  During his deposition, Ross described his role at the Academy as that of a supervisor, directing and assisting students in self-guided online course work.  (*Id.* at 13-14).  Compared to his Agriculture classes, Ross finds the Academy to be a much less dynamic environment, lacking in teacher-student interactions.  (*Id.*).  He receives a smaller salary and does not get to teach in his area of expertise.  (*Id.* at 30).

Appelman reports that the Agriculture program is thriving.  (Doc. # 27 at 28-29). Classes at the Complex are particularly enriching for students and the program as a whole is much more inclusive than it was during Ross' tenure.  (*Id.*).  Sorrell transports students back and forth to the Complex several times a day and receives some help from a newly-hired teaching assistant named Jackson Tolle.  (*Id.* at 81-85).  However, it is unclear whether this arrangement has actually resulted in a financial savings to the District.  (*Id.*; Doc. # 33 at 80-85).  Administrative efforts to expand the Agriculture program are ongoing. (Doc. # 27 at 32-34).

On October 16, 2013, Ross filed suit against the MCBE Defendants, alleging that they acted under color of state law to deprive him of his rights to free speech, expression

10) This seems to be the second complaint that Ross filed with the OEA in 2013.  Back in May, Ross complained of the Board's mishandling of the District of Innovation ("DOI") application.  *See* Ky. Rev. Stat. Ann. § 156.108.  Specifically, Ross alleged that the District failed to involve parents, educators and SBDM Council members in the process.  Ross also reported these issues to the EPSB.

and association guaranteed by the First and Fourteenth Amendments.  (Doc. # 1, p. 6, ¶ 20-21).  Ross also claims that the MCBE Defendants violated Kentucky Constitution § 2 and KRS § 160.380(3).  (*Id.* at p. 6, ¶ 22-23).  Defendant Pace was sued only in his individual capacity, while Defendant Ross was sued only in his official capacity.  (*Id.* at p.1).  This matter is now before the Court on the MCBE Defendants' Motion for Summary Judgment, which is fully briefed and ripe for review.  (Docs. # 24, 29 and 32).

## III.  Analysis

### A.    *Standard of Review*

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

### B.    *42 U.S.C. § 1983*

Pursuant to 42 U.S.C. § 1983:

[e]very person who, under color of any statute, ordinance, regulation, custom,

> or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

This statute aims to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).  Thus, § 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotations omitted).

To state a claim under 42 U.S.C. § 1983, a plaintiff must establish the following two elements: (1) the defendant acted under color of state law; and (2) the defendant's conduct deprived the plaintiff of rights secured under federal law.  *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 539 (6th Cir. 2012).  In this case, Ross alleges that the MCBE Defendants transferred him to a different teaching position at MCHS in retaliation for exercising his First Amendment rights.

### 1.    First Amendment Retaliation

To establish a prima facie case of First Amendment retaliation under 42 U.S.C. § 1983, a plaintiff must prove the following elements: (1) he engaged in constitutionally protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the protected conduct.  *Id.*  Once the plaintiff makes this showing, the burden of persuasion shifts to the defendants to "show by a preponderance

20

of the evidence that they would have terminated [the plaintiff] even had [ ]he not engaged in constitutionally protected activity."  *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).

### a.   Constitutionally Protected Speech

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). However, "public employees do not forfeit all their First Amendment rights simply because they are employed by the state or a municipality."  *Handy-Clay*, 695 F.3d at 539; *Cockrel*, 270 F.3d at 1048 (stating that teachers employed by a public school district qualify as public employees); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968) (rejecting the notion that "teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work").

In an effort to balance "the individual and societal interests that are served when employees speak as citizens on matters of public concern," and "the needs of government employers attempting to perform their important public function," the Supreme Court established a three prong test for evaluating whether a public employee's speech is constitutionally protected.  *Handy-Clay*, 695 F.3d at 540 (citing *Garcetti*, 547 U.S. at 417-18, 420).  The public employee's speech is entitled to First Amendment protection if he demonstrates the following elements: (1) his speech was made as a private citizen, rather than pursuant to his official duties; (2) his speech involved a matter of public concern; and (3) his interest as a citizen in speaking on the matter outweighed the state's interest, as an

employer, in "promoting the efficiency of the public services it performs through its employees." *Id.*

During discovery, Ross spent considerable time and effort developing his past disagreements with Moore, which involved several instances of potentially protected speech. However, Ross clarifies that these conflicts "serve[ ] only as context and background to [Ross'] conduct and claims in the matter before the Court." (Doc. # 29 at 22, n. 8). He then contends that the following statements, all made during Pace's tenure, constitute protected speech under the First Amendment: (1) his Open Records Request of February 22, 2013; (2) his suggestion that the MCEA should conduct the search for the next superintendent; and (3) his request to attend ESPB meetings.[11] (*Id.* at 21-23). The Court will apply *Handy-Clay*'s three-prong test to each of these statements.

### i.    Speaking as a Citizen

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti*, 547 U.S. at 421. Accordingly, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22. "It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.*

To determine whether the plaintiff's statements were made pursuant to his official duties, courts must examine the content and context of his speech. *Handy-Clay*, 695 F.3d

---

11) In their Motion for Summary Judgment, the MCBE Defendants reference a fourth statement that Ross made during Pace's tenure. In April of 2012, Ross orally requested permission from the Board to conduct an activity with his students at the greenhouse. However, Ross does not include this in his list of protected statements, presumably because that request was directly related to his official teaching duties.

at 540. Relevant factors include whether the plaintiff made statements to superiors, whether the plaintiff was simply expressing a "quintessential employee beef," whether the plaintiff spoke outside or inside of the workplace and whether the plaintiff spoke about the subject-matter of his employment. *Id.*

Sixth Circuit case law suggests that an Open Records Request is an act of speech that may qualify for First Amendment protection. *See Handy-Clay*, 695 F.3d at 545 (noting that the Plaintiff's claim was "supported by the close temporal proximity between [her] e-mails informing her superiors about her requests for various records and her termination"); *Handy-Clay v. City of Memphis*, No. 10-2927-STA-tmp, 2013 WL 5305239 at *13 (W.D. Tenn. Sept. 19, 2013) (holding that "the Plaintiff's act of filing the records request constituted a protected speech activity for purposes of her First Amendment retaliation claim"). Based on these recent opinions, the Court concludes that Ross' Open Records Request is "speech" and will proceed to consider whether he spoke as a citizen or pursuant to his official duties as a teacher.

Ross sent MCBE Chair Rosser a letter articulating his Open Records Request. (Doc. # 29-5). Because Ross printed the letter on MCEA stationery, and identifies himself as MCEA President, it seems that he is acting in his capacity as a leader of the MCEA. (*Id.*). He makes no mention of his position as MCHS Agriculture teacher. (*Id.*). Although Ross' involvement in the MCEA certainly relates to his teaching position, deposition testimony suggests that the District did not condition employment on participation in the MCEA or any other teaching association. (Docs. # 17-1 at 9-11 and 202; 25 at 10; 33 at 8). After all, the deponents who were employed by the District as MCHS faculty members did not necessarily participate in the same professional organizations, if any. (*Id.*).

23

Moreover, Ross' concerns about fiscal responsibility and transparency in the District motivated his request.  Aside from the fact that he had previously voiced concerns about the District's spending habits, the Court can see no other reason to request copies of the independent forensic audit, names of employees who made restitution to the District and salary figures for all certified employees.  (Doc. # 29-5).  The District's spending habits may have been important to Ross, as a father[12] and an employee of the District, but he did not undertake this inquiry pursuant to his official job duties.  Ross was hired to teach Agriculture to high school students, not to investigate allegations of improper spending or serve as an auditor.  Therefore, the Court concludes that Ross was speaking as a private citizen when he made the Open Records Request.

The Court now turns to Ross' suggestion to Pace that the MCEA be allowed to conduct the superintendent search.  First, the Court notes that "a teacher's representation of [education associations] and other teachers at board meetings, in press and in conferences with school administrators is a protected First Amendment Activity."  *Reichert v. Draud*, 701 F.2d 1168, 1170 (6th Cir. 1983).  Although Ross made this suggestion during a private meeting with Pace, the setting of the statement is not dispositive.  After all, "[n]either the First Amendment itself nor [the Sixth Circuit's] decisions indicate that freedom of speech is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."  *Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir. 2000); *see also Leary v. Daeschner*, 228 F.3d at 738 (holding that plaintiff's speech was protected by the First Amendment notwithstanding the fact that it

---

12) Ross' daughter was an MCHS students during the 2012-2013 school year.  (Doc. # 17-1 at 63; 17-2 at 109; 17-5 at 58).

occurred in private). With this in mind, the Court will proceed to consider whether Ross was speaking as a citizen when he made this suggestion.

When Ross asked Pace to let the MCEA conduct the superintendent search, he was again acting in his capacity as President of the organization. Again, his participation in the MCEA likely touched on issues related to his teaching position, but his employment as an Agriculture teacher was not conditioned on membership in that organization. As a teacher, Ross almost certainly had an interest in searching for the next superintendent because the individual who assumed that role would be the policymaker for the District. Perhaps his conflicts with the previous superintendent heightened that interest. However, the District did not hire Ross to search for the next superintendent. Because his suggestion was outside the scope of his official duties, the Court again finds that Ross was speaking as a citizen.

Ross' request to participate in the last two EPSB meetings of the 2012-2013 school year is a closer call. First of all, the Court is unsure whether a requested absence from school in order to attend an event is "speech." One could generally construe the employee's request as asking to be absent from school, which may be done for any number of reasons that have nothing to do with the First Amendment. On the other hand, one could view the employee's request as asking permission to engage in an activity that is potentially subject to First Amendment protection. The same concerns surface as to whether the statement is made pursuant to the employee's official duties. Because teachers must generally notify administrators of a planned absence from school, one could classify this request as speech pursuant to official duties. However, it is also worth noting that Ross' request relates to his participation in another professional association, which is

25

a potentially protected activity.  The Court will belabor these points no further; assuming *arguendo* that Ross was speaking as a citizen when he asked Pace for permission to attend the EPSB meetings, his request fails the second prong of the analysis for reasons stated below.

As a final matter, the Court will address the MCBE Defendants' position that none of Ross' statements qualify as speech by a citizen according to *Fox v. Traverse City Area Public Schools Board of Education*.  605 F.3d 345 (6th Cir. 2010).  In *Fox*, the Sixth Circuit held that speech made pursuant to "*ad hoc* or *de facto* duties not appearing in any written job description" are not protected if they owe their existence to the plaintiff's professional responsibilities.  *Id.* at 348.  Although the MCBE Defendants believe that to be the case here, they offer only two examples of such speech–Ross' statements during Moore's tenure and his statements at the Board meeting in Spring of 2013.  However, Ross has made it clear that his First Amendment retaliation claim is not based on either of these examples.

The Court also notes that the *Fox* case centered around a special education teacher's complaints to her immediate supervisors about the size of her teaching caseload. *Id.* at 349.  As the Sixth Circuit observed, the plaintiff's class size was directly related to her conditions of employment, and thus, not entitled to First Amendment protection.  *Id.*  If the Court were to conclude that Ross' statements were also made pursuant to *ad hoc* duties, even though he voiced his concerns about the District's integrity and fiscal responsibility as a leader of a professional organization, then it is hard to imagine a situation in which a public school teacher could speak out.  Would not any speech about the District's affairs conceivably qualify as speech pursuant to *ad hoc* duties?  The Court thinks that such an interpretation takes *Fox* too far.  Having found that Ross' statements were not made

26

pursuant to his official duties, the Court will now consider whether he spoke about matters of public concern.

### ii.    Matters of Public Concern

Whether an employee's speech qualifies as a matter of public concern is a question of law, determined by looking to the "content, form, and context of a given statement, as revealed by the whole record." *Handy-Clay*, 695 F.3d at 543 (internal citations omitted). "Speech touching on public concern includes speech on any matter of political, social, or other concern to the community." *Id.* (internal quotations omitted).  While a plaintiff's speech is not automatically deemed to touch on matters of public concern simply because it relates to public funds or government efficiency, the Supreme Court has found that statements "bring[ing] to light actual or potential wrongdoing or breach of public trust" do so qualify. *Id.* (quoting *Connick v.* Myers, 461 U.S. 138, 148 (1983)); *see also Leary*, 349 F.3d at 899-900 (finding that allegations that the school board violated state law and its own policies constitute protected speech, thus implying it is a matter of public concern).

As explained in the previous section, Ross sought to obtain a copy of the independent forensic audit, information about employee restitution to the District and current salary figures for all certified employees.  (Doc. # 29-5).  When this Open Records Request is considered against the District's recent history of fiscal irresponsibility, the Court finds that the Request is certainly a matter of public concern.  The allocation of financial resources in the District not only affects the teachers who must operate within budget constraints, but also the parents and students who rely on the District to provide a quality public education.  In fact, all Mason County taxpayers arguably have an interest in this matter, as their tax dollars support the public school system.

27

Ross' suggestion that the MCEA should conduct the superintendent search similarly constitutes a matter of public concern.  In the wake of the District's audit and Moore's unanticipated retirement, the selection of a qualified and honest individual was of particular importance.  The superintendent's efforts can have a significant impact on the daily experiences of students, parents and teachers, as he is responsible for implementing educational policies, serving as liaison between the Board and the schools and ensuring that the system as a whole operates efficiently.

However, Ross' request to attend the ESPB meetings is more akin to an internal dispute regarding attendance policies and teaching duties.  Ross had a high number of absences due to extracurricular activities that year, several of which he attributed to the EPSB.  (Doc. # 29-6).  While Ross interpreted Pace's request for documentation as an attempt to interfere with his attendance at these events, the record suggests that Pace was simply unwilling to permit further absences before speaking with the Executive Director of the EPSB.  (Doc. # 33 at 66-67).  Although Pace was concerned that Ross' students would suffer from his frequent absences, he permitted Ross to attend the EPSB meetings after receiving verification from the Executive Director.  (*Id.*).  The Court finds that such matters are not of public concern.  Having determined that Ross was speaking as a citizen about matters of public concern on two occasions, the Court will now proceed to the third prong of its analysis.

### iii.    *Pickering* Balancing Test

If the plaintiff demonstrates that he was speaking as a private citizen about a matter of public concern, courts must "balance the interests of the public employee 'as a citizen, in commenting upon matters of public concern, and the interest of the State, as an

28

employer, in promoting the efficiency of the public services it performs through its employees.'" *Handy-Clay*, 695 F.3d at 545 (quoting *Pickering*, 391 U.S. at 568). Relevant considerations include "'whether an employee's comments meaningfully interfere with the performance of h[is] duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship or loyalty and trust required of confidential employees.'" *Cockrel*, 270 F.3d at 1053 (quoting *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994)). At this juncture, the defendant must proffer legitimate grounds for the allegedly retaliatory action. *Id.*[13]

In this case, the Court must weigh Ross' interest in speaking about the District's integrity and fiscal responsibilities against the MCBE Defendants' interest in promoting the efficiency of public education. The MCBE Defendants maintain that Ross was transferred to conserve District funds, promote student safety and give remedial students more opportunities to become career-ready. (Doc. # 24-1 at 24-28). Although these goals are important, there is scant evidence that Ross' protected speech interfered with the performance of his duties or undermined the MCBE Defendants' goals. The Court has only Pace's statement that the Open Records Request made several faculty members uncomfortable because they did not want their salaries to become public knowledge. (Doc. # 33 at 39). Although suggestive of disharmony in the workplace, this uncorroborated hearsay is insufficient to find that Ross' interests are subordinate to the MCBE Defendants' concerns. This conclusion is consistent with the Sixth Circuit's understanding of the

---

13) The third prong of the protected speech analysis allows the defendant to set forth legitimate reasons for the allegedly retaliatory action so that the Court may properly balance the interests of each party. However, this exercise should not be confused with the burden shift that occurs once the plaintiff has stated a prima facie case of First Amendment retaliation.

*Pickering* balancing test.   *See Cockrel* 270 F.3d at 1055 (finding that the employer's concern with workplace efficiency, harmony and discipline did not tilt the *Pickering* scale in their favor because the disruptive consequences of the speech could be traced to the employer's express decision to allow that speech).   Thus, Ross has satisfied the first element of his prima facie case of First Amendment retaliation.

### b.   Adverse Action

Termination from employment clearly qualifies as adverse action. *See Cockrel*, 270 F.3d at 1055.  However, involuntary transfer may also constitute adverse action, even if there is no change in grade or salary. *Leary v. Daeschner*, 349 F.3d 888, 900-901 (6th Cir. 2003) (noting that the act of transfer can cause harm to a teacher's reputation and negatively impact daily experiences).

The MCBE Defendants do not contest that Ross' transfer from Agriculture teacher to Academy teacher constitutes adverse action.  After teaching Agriculture at MCHS for twenty-five years, Ross was removed from his area of expertise and placed in a remedial academic program.  (Doc. # 17-1 at 13-14).  Ross was not entitled to statutorily mandated extra days in his new position, so his salary was reduced by about $18,000.  (Doc. # 17-3 at 8).  Accordingly, Ross' transfer qualifies as adverse action.

### c.   Motivating Factor

To satisfy the final element of a prima facie case for First Amendment retaliation, the plaintiff "must demonstrate that [the] speech was 'a substantial or motivating factor in the employer's decision to take the adverse employment action against [the employee]." *Handy-Clay*, 695 F.3d at 545.  A motivating factor is "one without which the action being challenged simply would not have been taken." *Id.* (internal quotations omitted).  "[T]he

nonmoving party may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent."   *Cockrel*, 270 F.3d at 1055. Instead, "the employee must link the speech in question to the defendant's decision to dismiss her."  *Id.* (internal citations omitted). This determination is usually best-suited for a jury.  *Handy-Clay*, 695 F.3d at 545.

Ross initially claimed that Pace had an ongoing mentor-mentee relationship with Moore, which partially motivated the transfer decision.  (Doc. # 1, p. 4, ¶ 11).  When discovery proved this allegation to be untrue, Ross abandoned all attempts to tie his past conflicts with Moore to Pace's transfer decision.  (Doc. # 29 at 25-26).  Because Ross has no way to link these two superintendents and no other evidence that he was singled out or treated differently for his speech, the MCBE Defendants argue that he cannot satisfy the third prong of his prima facie case.  (Doc. # 24-1 at 6).

Ross responds that there is sufficient evidence to satisfy the third element of his prima facie case.  (Doc. # 29 at 25-26).  First, he argues that the "proximity between his protected speech and his transfer support an inference of causation."  (*Id.*).  Ross met with Pace about the superintendent search in December 2012 and made his Open Records Request in February 2013.  (Docs. # 17-2 at 79, 105; 29-5; 33 at 57-58).  Pace notified Ross of his transfer in early May.  (Doc. # 29-1).  Thus, about six months elapsed between Ross' first statement and his transfer.

This six month time period is not especially strong evidence that Ross' speech motivated Pace's transfer decision.  *See Handy-Clay*, 695 F.3d at 546 (finding that "the chronology of events supports an inference of causation, particularly because [the plaintiff] was terminated the day after she made her own records requests").  Neither is it attenuated

31

enough to break the chain of causation.  *See Cockrel*, 270 F.3d at 1056 (holding that the temporal proximity between the hemp speaker's visit, which occurred on the last day of 1995-1996 school year, and the plaintiff's unscheduled teaching evaluations during the 1996-1997 school year constituted sufficient evidence to establish causation).

It is also worth noting that Ross' speech received less than enthusiastic reception. (Doc. # 29 at 25-26).  Pace admitted as much in his deposition, stating that he was not particularly open to Ross' suggestions about the superintendent search.  (Doc. # 33 at 44-46).  He thought it would be best to have an outside entity conduct the search, given the District's recent negative publicity.  (*Id.*).  Pace also stated that he was hesitant to release any information in response to Ross' Open Records Request, again citing current perceptions about the District.  (*Id.* at 57-58).

Finally, Ross argues that the MCBE Defendants' proffered reasons for his transfer are "suspect."  (Doc. # 29 at 25-26).  The MCBE Defendants maintain that they replaced Ross with an Agriculture teacher who could transport students in order to save the District money.  (Doc. # 24-1 at ). Ross was unable to transport students to and from the Complex because his driving privileges had been suspended.  (Doc. # 33 at 55).  The record also reflects that none of the District's drivers could assume responsibility for bussing these students.  (Doc. # 26 at 80).  However, Ross questions whether this solution really resulted in a net savings for the District.  (Doc. # 29 at 25-26).  Not only did he replace a part-time Academy teacher, who presumably earned less than Ross, but MCHS also hired an Agriculture assistant for Sorrell.  (Doc. # 27 at 81-85; 33 at 81-82).  Ross posits that it is not truly cheaper to employ a full-time Agriculture teacher, an Agriculture assistant and a full-time Academy teacher, as opposed to a full-time Agriculture teacher, a part-time Academy

teacher and a bus driver.

Ross also takes issue with the utility of his vocational certification at the Academy. (Doc. # 29 at 25-26).  He testified that he merely supervises the students in self-guided course work, which may or may not include any vocational education offerings.  (Doc. # 17-1 at 16-17).  Currently, there are no Academy students pursuing Agriculture studies through the online learning system.  (*Id.*).  When asked how Ross' vocational training would aid Academy students, Pace, Appelman and Belcher could only give vague answers about how he could help more students become career-ready.  (Docs. # 25 at 66-67; 27 at 41; 33 at 84).  They also indicated that Ross' inability to drive a bus was the primary reason for moving him out of his current position, and the Academy turned out to be the best place to transfer him.  (*Id.*)

Taking all of this evidence together–the temporal proximity between Ross' statements and his transfer, the cool reception his statements received and the questionable reasons behind his transfer–the Court concludes that a jury could find, by a preponderance of the evidence, that Ross' protected speech motivated his transfer to the Academy.

### d.    *Defendants' Rebuttal*

Once the plaintiff establishes the three elements of a First Amendment retaliation claim, the burden of persuasion shifts to the defendants to "show by a preponderance of the evidence that they would have terminated [the plaintiff] even had [ ]he not engaged in constitutionally protected activity."  *Cockrel*, 270 F.3d at 1056.  Because the defendants bear the ultimate burden of persuasion on this issue at trial, they must do more than "bring forth enough evidence to allow a jury to find that they would have terminated [the plaintiff]

regardless of h[is] speech." *Id.* The plaintiff having established a prima facie case of First Amendment retaliation, "summary judgment for the defendants is proper only if the evidence is such that every reasonable juror would conclude that the defendants have met their burden of showing that [the plaintiff] would have been terminated" even if they had not engaged in the protected speech. *Id.*

The MCBE Defendants cite two reasons for Ross' transfer: (1) the need to bus Agriculture students to and from the Complex in a cost-efficient manner; and (2) the concerns about increasing career readiness certifications. (Doc. # 24-1 at 4-8). However, there is relatively little documentation about the actual savings to the District and the explanation for the transfer to the Academy is vague. (Doc. # 27 at 81-85; 33 at 81-82). As detailed in the previous section, Ross produced sufficient evidence to support a finding of causation. Specifically, Ross pointed to the relatively close temporal proximity between his speech and the transfer, the reception his statements received and the questionable reasons behind his transfer.

Having laid out the pro-plaintiff inferences that could be drawn from this evidence, the Court must point out that pro-defendant inferences could also be made. The speech at issue in this case is relatively tame compared to some of the comments that Ross made during Moore's tenure, and yet, Ross was never subjected to adverse action for those statements. Even considering the difference in leadership, some may find it odd that these two statements would result in adverse action if his previous more inflammatory speech did not. Pace also had some persuasive reasons for rejecting Ross' suggestions. Given the District's recent difficulties, it was probably prudent to avoid any appearance of impropriety and ask an outside entity to conduct the superintendent search. Perhaps the District

34

succeeded in saving money by transferring Ross and hiring Sorrell.  However, the record is devoid of any such savings.

In sum, the evidence before this Court is susceptible to different interpretations. Viewed in one light, it is favorable to Ross, while from another angle, it lends weight to the MCBE Defendants' position.  For all of these reasons, the MCBE Defendants are not entitled to judgment as a matter of law on Ross' claim for First Amendment retaliation pursuant to § 1983.  Therefore, the MCBE Defendants' Motion for Summary Judgment is denied.

### C.    Kentucky Constitution § 2

"Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."  Ky. Const. § 2.  This "prohibition against arbitrary action applies to all public bodies and all public officials, e.g., school boards and school superintendents, in their assertion or attempted exercise of political power."  *Bd. of Educ. of Ashland v. Jayne*, 812 S.W.2d 129, 131 (Ky. 1991); *see also Boateng v. Fayette Bd. of Ed.*, No. 2004-CA-001181-MR, 2005 WL 1415922 at *6 (Ky. App. 2005) (quoting *Jayne*, 812 S.W.2d at 132).

In *Board of Education of Ashland v. Jayne*, the plaintiffs argued that their transfer from one teaching position to another in the same school district, with no reduction in salary or benefits, was arbitrary and capricious.  812 S.W.2d at 131.  The Kentucky Supreme Court identified the key inquiry as "whether the school's action was based on a 'constitutionally impermissible reason.'"  *Id.*  The Court ultimately answered this question in the negative, reasoning that "the General Assembly of Kentucky has clearly established that a teacher who has a contract to teach, has no absolute right to a particular teaching

job in a particular school. *Id.*; *see also* Ky. Rev. Stat. Ann. § 161.760(4) ("Employment of a teacher, under either a limited or a continuing contract, is employment in the school district only and not in a particular position or school.").

The *Jayne* court also noted that "a jury is not the proper vehicle or forum to determine whether a constitutional provision has been violated." *Id.* However, if a claim for violations of Kentucky Constitution § 2 is coupled with a § 1983 claim, case law suggests that courts may decide the state law claim at the close of proof at trial. *Friedrich v. City of Anchorage*, No. Civ. A. 3:04-CV-742-H, 2006 WL 897091 at *2, n. 3 (W.D. Ky. Mar. 30, 2006) (noting that the state law standard was essentially the same as the federal standard for a selective enforcement claim under § 1983).

In this case, Ross alleges that the MCBE Defendants' actions "were taken for reasons unrelated to the sound and efficient management of the school and outside of their legal authority and as such, constitute arbitrary and capricious acts in violation of Section 2 of the Kentucky Constitution." (Doc. # 1, p. 6, ¶ 22). To properly evaluate Ross' claim for violations of Kentucky Constitution § 2, the Court must focus on whether the MCBE Defendants' transferred Ross based on a constitutionally impermissible reason. A similar question lies at the heart of Ross' § 1983 claim–whether he was transferred in retaliation for exercising his First Amendment rights. Because both claims turn on the same issue, and because summary judgment is not warranted on Ross' § 1983 claim, the Court finds it appropriate to follow the example of *Friedrich* and decide the Kentucky Constitution § 2 claim at the close of proof at trial. Accordingly, summary judgment on this claim is denied.

### D.      KRS § 160.380(3)

No school superintendent shall "assign a certified or classified staff person to an alternative education program as part of any disciplinary action taken pursuant to KRS § 161.011 or § 161.790 or as part of a corrective action plan established pursuant to the local district evaluation plan." Ky. Rev. Stat. Ann. § 160.380(3); *see also* Ky. Rev. Stat. Ann. § 161.011 (governing classified employees); Ky. Rev. Stat. Ann. § 161.790 (dealing with termination of contracts by board).  Alternative education programs "exist[ ] to meet the needs of students that cannot be addressed in a traditional classroom setting but through the assignment of students to alternative classrooms, centers, or campuses that are designed to remediate academic performance, improve behavior, or provide an enhanced learning experience." Ky. Rev. Stat. Ann. § 160.380(1)(a).   "Alternative education programs do not include career or technical centers or departments." *Id.*

Districts must ensure that alternative education programs align with college and career readiness outcomes, are not limited in scope or design and include training to build capacity of staff and administrators to deliver high-quality services. *See* 704 KAR 19:002, Section 2(1)(a).   To teach in an alternative education program, "teachers and administrators shall be subject to the teacher certification requirements established in KRS § 161.020, and shall comply with the classified and certified assignment restrictions established in KRS § 160.380(3)." *Id.* at Section 6.

The MCBE Defendants argue that Ross' claim must fail because the Academy is not an "alternative learning program," as that term is used in the statute.  (Doc. # 24-1 at 9-10). In support of this proposition, the MCBE Defendants point out that the Academy is for students who need special attention academically, either because they are falling behind

37

in certain classes or do not function well in the conventional classroom environment.  (*Id.*).  MCHS has a separate alternative school for students with disciplinary problems, which does fit the definition of an "alternative learning program."  (*Id.*).  This is an artificial distinction, in the Court's view.  The statutory definition of an "alternative learning program" is not limited to students with behavioral problems.  It contemplates programs designed to remediate student performance and provide an alternative learning environment, which is precisely what the Academy aims to accomplish.

The MCBE Defendants then argue that Ross cannot prove he was transferred as a disciplinary measure, citing to the same legitimate reasons detailed in previous sections of this opinion.  (*Id.*).  Although there is relatively little Kentucky case law dealing with violations of KRS § 160.380(3), the Court believes that the outcome of Ross' § 1983 claim could impact this claim.  If the evidence at trial shows that the MCBE Defendants were motivated by Ross' speech, then such a finding would likely lead to the conclusion that Ross was also transferred for disciplinary reasons, in violation of KRS § 160.380(3).  Because there is a genuine issue of material fact as to the motivation for Ross' transfer, the Court finds that summary judgment is also premature on this claim.

### E.   *Immunity Issues*

#### 1.   Qualified Immunity for Pace as to Federal and State Law Claims

"Qualified immunity is a personal defense that applies only to government officials in their individual capacities."  *Benison v. Ross*, 765 F.3d 649, 665 (6th Cir. 2014).  It generally protects government officials who perform discretionary functions[14] from liability

---

14) Discretionary functions involve "significant decision-making that entails personal deliberation, decision and judgment," while ministerial functions "involve the execution or implementation of a

for civil damages, so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Courts must consider the following two elements in determining whether a state actor is entitled to qualified immunity: (1) whether "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right;" and (2) "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 232 (6th Cir. 2005) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  A right is clearly established if it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Because the standard is the same for qualified immunity claims asserted under Kentucky state law, the following analysis will apply with equal force to Ross' federal and state law claims.  *See Yanero v. Davis*, 65 S.W.3d 510, 521-22 (Ky. 2001) (stating that qualified official immunity applies to employees if their actions are discretionary and made in good faith and within the scope of their employment).

In this case, the Court has already found that there is a genuine issue of material fact as to whether Ross' statements motivated his transfer.  Viewing the evidence in the light most favorable to Ross, a reasonable jury could find that Pace violated Ross' First

---

decision and entail only minor decision-making." *Davis v. Holly*, 835 F.2d 1175, 1178 (6th Cir. 1987).  Officials performing ministerial functions are not entitled to qualified immunity.  *Id.* (quoting *People of Three Mile Island v. Nuclear Reg. Comm'rs*, 747 F.2d 139, 143 (3d Cir. 1984)).

Amendment rights by retaliating against him for his speech.  *See Marcum ex rel. C.V. v. Bd. of Educ. of Bloom-Caroll Local Sch. Dist.*, 727 F. Supp. 2d 657, 675 (S.D. Ohio July 23, 2010) (finding that, because the plaintiffs' Title IX claim contained a genuine issue of material fact as to whether their complaints about sexual harassment motivated disciplinary action, a reasonable jury could also find that the school principal "violated the Plaintiffs' First Amendment rights by retaliating against them in response to their complaints about sexual harassment").

As for the second prong of the analysis, courts have repeatedly recognized the right to be free from retaliation for speech protected by the First Amendment.  *Scott v. Churchill*, 377 F.3d 565, 572 (6th Cir. 2004); *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998). Because this case law predates the incidents at issue here, the Court concludes that "[a] reasonable school official would have known that such retaliation was unconstitutional." *Id.*  Therefore, Pace is not entitled to qualified immunity for either the federal or state law claims.

### 2.   Governmental Immunity for Ross and the Board as to State Law Claims

The concept of governmental immunity, "derived from the traditional doctrine of sovereign immunity, [ ] limits imposition of tort liability on a government agency."  *Yanero*, 65 S.W.3d at 519.  It is founded on the principle that "courts should not be called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions."  *Id.*  Accordingly, a "state agency is entitled to immunity from tort liability to the extent that it is performing a governmental, as opposed to a proprietary, function."  *Id.* (applying this principle to a county board of education).

40

Proprietary functions are acts occurring when a government agency is "engaged in a business of a sort theretofore engaged in by private persons or corporations for profit," while governmental functions are those that are integral to government. *Yanero*, 65 S.W.3d at 520; *Thorpe ex rel. D.T. v. Breathitt Cnty. Bd. of Educ.*, 932 F. Supp. 2d 799, 802-803 (E.D. Ky. Mar. 22, 2013).

However, *Yanero* was "silent as to whether this immunity extends to claims for equitable relief." *Baze v. Ky. Dep't of Corr.*, Civ. A. No. 3:08-54-DCR, 2008 WL 5082881 at *4 (E.D. Ky. Nov. 25, 2008). Based on this seemingly purposeful omission, "coupled with the fact that the Supreme Court of Kentucky did not discuss governmental immunity in a later case where a plaintiff sought equitable relief, it seems that the Supreme Court of Kentucky limited governmental/official immunity to claims seeking monetary damages." *Id.* (quoting *Young v. Hammond*, 139 S.W.3d 859 (Ky. 2004); *Roberts v. Fayette Bd. of Educ.*, 173 S.W.3d 918, 923 (Ky. App. 2005)).

The MCBE Defendants argue that Supt. Ross and the Board are entitled to governmental immunity on Ross' state law claims for violations of Kentucky Constitution § 2 and KRS § 160.380(3). (Doc. # 24-1 at 16-17). However, Ross responds that governmental immunity is inappropriate in this instance because he seeks equitable relief in the form of back pay and reinstatement to his former position rather than money damages. (Doc. # 29 at 33). This argument is supported by Ross' prayer for relief, which asks the Court to "declare the rights of the parties to this action and declare the Plaintiff's reassignment null and void." (Doc. # 1 at 7). Because Supt. Ross and the Board are the current leaders of the District, Ross maintains that they are the only Defendants in this action who are capable of granting such relief. (Doc. # 29 at 33). Thus, Ross argues that

41

Supt. Ross and the Board must be named defendants in order for him to obtain complete relief in this matter.[15]  (*Id.*). Given Ross' emphasis on equitable relief as to Supt. Ross and the Board, and in light of Kentucky law's tendency to limit governmental immunity to claims for money damages, the Court finds that Supt. Ross and the Board are not entitled to governmental immunity on Ross' state law claims.  Accordingly, the MCBE Defendants' Motion for Summary Judgment must be denied in full.

### IV.  Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that the MCBE Defendants' Motion for Summary Judgment (Doc. # 24) be, and is, hereby **denied**.

**IT IS FURTHER ORDERED** that this matter shall come before the Court for a **Status Conference on Thursday, April 16, 2015 at 9:30 a.m. in Covington**.  The parties shall be prepared to schedule this matter for final pretrial conference and trial at that time.

---

15) Because Ross brings his § 1983 claim against Supt. Ross and the Board, the Court believes that he will seek to recover money damages from these defendants.  However, a governmental entity such as the Board "cannot be held liable for the acts of its employees on a *respondeat superior* theory."  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Liability will only attach if the alleged constitutional violations are the result of an official policy or custom.  *Id.* at 694.  Absent such evidence, Ross would only be able to recover against the Board by suing Pace in his official capacity as well as his individual capacity.  Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent," and thus, "in all respects other than a name, [are] to be treated as a suit against the entity.  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  In fact, the only difference between suing an individual in his official capacity versus his individual capacity is who pays the money damages.  "[W]hile an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official capacity suit must look to the government entity itself."  *Id.*  Any attempts to amend the complaint shall be governed by Federal Rule of Civil Procedure 15(a).

This 24th day of March, 2015.



Signed By:

__David L. Bunning__

United States District Judge

G:\DATA\Opinions\Covington\2013\13-186 MOO Denying MSJ.wpd